**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH DAKOTA**
ROOM 211
FEDERAL BUILDING AND U.S. POST OFFICE
225 SOUTH PIERRE STREET
PIERRE, SOUTH DAKOTA 57501-2463

IRVIN N. HOYT
BANKRUPTCY JUDGE

TELEPHONE (605) 224-0560
FAX (605) 224-9020

July 12, 2006

James A. Wyly, Esq.
Attorney for Dennis Hellwig and
Hub City Livestock Auction, Inc.
Post Office Box 1030
Aberdeen, South Dakota 57402-1030

Timothy M. Engel, Esq.
Attorney for First State Bank of Roscoe
Post Office Box 160
Pierre, South Dakota 57501

Subject: ***In re Jeffrey F. Fix and Marie M. Fix***
Chapter 13; Bankr. No. 04-30019

Dear Counsel:

The matters before the Court are the Motion for Application of Funds filed by First State Bank of Roscoe; the Motion for Allowance of and Payment of Administrative Expense filed by Hub City Livestock Auction, Inc.; and the Motion for Allowance of and Payment of Administrative Expense filed by Dennis Hellwig. These are core proceedings under 28 U.S.C. § 157(b)(2). This letter decision and accompanying orders shall constitute the Court's findings and conclusions under Fed.Rs.Bankr.P. 7052 and 9014(c). As set forth below, First State Bank of Roscoe's motion will be denied; Hub City Livestock Auction, Inc.'s motion will be denied; and Dennis Hellwig's motion will be granted in part.

**Summary.** Jeffrey F. Fix ("Debtor") and Marie F. Fix (collectively, "Debtors") filed a petition for relief under chapter 13 of the bankruptcy code on February 26, 2004.

On June 30, 2005, First State Bank of Roscoe ("First State Bank") filed a Motion for Application of Funds, in which it asked the Court to permit First State Bank to apply $21,594.33 – representing the proceeds of the sale of certain sheep allegedly "held by debtors" and "owned either by Stephanie Fix[1] or the debtors" – to its secured claim against Debtors. On July 22, 2005,

[1] Stephanie Fix is Debtors' daughter.

Hub City Livestock Auction, Inc. ("Hub City Livestock") filed an objection to First State Bank's motion, in which it argued First State Bank had no claim to the $21,594.33, because First State Bank had already received the proceeds of the sale of the sheep belonging to Stephanie Fix, and the remaining proceeds were from the sale of "lambs belonging to the Debtors as a result [of their] taking in ewes on shares after the Petition for bankruptcy was filed."

On August 12, 2005, Hub City Livestock filed a Motion for Allowance of and Payment of Administrative Expense, in which it asked the Court to allow an administrative expense for sums it allegedly lent Debtors on February 10, 2005 ($15,000) and April 11, 2005 ($6,000). On that same date, First State Bank filed an objection to Hub City Livestock's motion, in which it argued any such loan had not been made in the ordinary course of business and thus required advance Court approval to qualify as an administrative expense.[2]

On August 17, 2005, Dennis Hellwig ("Hellwig") filed a Motion for Allowance of and Payment of Administrative Expense that was offered as "an alternative claim to that of Hub City Livestock" and was virtually identical to Hub City Livestock's motion. On August 19, 2005, First State Bank filed an objection to Hellwig's motion, that was likewise virtually identical to its objection to Hub City Livestock's motion. On August 25, 2005, Eisenbeisz Farms, Inc. filed a letter objection to Hellwig's motion, in which it briefly described the circumstances giving rise to its pre-petition claim against Debtors and stated its belief it was entitled to payment of its claim.[3]

---

[2] First State Bank also argued Hub City Livestock's motion was not timely filed under 11 U.S.C. § 503(a). First State Bank did not indicate a date by which Hub City Livestock's motion should have been filed to have been considered timely. In any event, the Court has not yet confirmed a plan in this case. Therefore, the Court finds Hub City Livestock's - and Dennis Hellwig's virtually identical motion - to have been timely.

[3] By letter dated August 29, 2005, the Court advised Eisenbeisz Farms, Inc. that if it wished to be heard at any hearing on Hellwig's motion, it would need to retain an attorney to represent it. *See* 28 U.S.C. § 1654; Fed.R.Bankr.P. 9010(a); and *Ackra Direct Marketing Corp. v. Fingerhut Corp.*, 86 F.3d 852, 857 (8th Cir. 1996). It did not do so.

All three motions came before the Court on October 11, 2005.[4] The Court heard the testimony of Debtor; Hellwig; Lewis Dirks, a private investigator hired by First State Bank; and Curt Warkentien, a former employee of First State Bank. The Court also received a copy of Hellwig's February 10, 2005 check for $15,000 payable to Debtor; a copy of Hellwig's April 11, 2005 check for $6,000 payable to Debtor; a copy of Hub City Livestock's June 28, 2005 sale receipt and check for $21,594.33 payable to First State Bank for Debtors' share of certain lambs; and a copy of Hub City Livestock's June 28, 2005 sale receipt and check for $30,088.19 payable to First State Bank for Stephanie Fix's sheep. Following the submission of briefs, the matters were taken under advisement.[5]

**First State Bank's Motion for Application of Funds.** First State Bank claims a perfected security interest in all farm products owned by Debtors. However, that security interest does not extend to property acquired by Debtors post-petition, unless that property constitutes proceeds, product, offspring, or profits of property acquired by Debtors pre-petition. 11 U.S.C. § 552(a) and (b).

Debtor testified that in August 2004, Debtors began caring for certain ewes owned by Peter Carmichael ("Carmichael") in return for a 40% share of the eventual lamb crop, and that in October or early November 2004, Debtors began caring for certain ewes owned by Dion Van Well ("Van Well"), again in return for a 40% share of the eventual lamb crop. Debtors did not acquire an interest in any of these lambs until Carmichael and Van Well moved their flocks onto Debtors' land, which was several months after Debtors filed their

---

[4] By order dated September 15, 2005, Hub City Livestock's motion and Hellwig's motion were consolidated for the purposes of an evidentiary hearing. No one appeared on behalf of Eisenbeisz Farm, Inc. at the hearing.

[5] With its post-hearing brief, First State Bank submitted an affidavit of John Beyers and an affidavit of Brent A. Wilbur, to which were appended an affidavit of Valerian Goetz, a letter from Debtor, and various bank statements. First State Bank did not ask - and the Court did not give it permission - to supplement the record in this fashion. Accordingly, the Court has not considered any of the matters set forth in those affidavits or attachments or any of the arguments First State Bank made with respect to them.

petition.[6]

At the conclusion of the hearing, First State Bank argued Debtors' share of the lambs was proceeds of property subject to its security interest, because "equipment, machinery, and real estate" in which First State Bank claimed a security interest, "went into producing [the lambs]." First State Bank failed to offer any authority in support of such a proposition.

The Court concludes the lambs were the offspring of the ewes owned by Carmichael and Van Well, not the proceeds, product, offspring, or profits of property acquired by Debtors pre-petition. Thus, pursuant to § 552(b)(1), First State Bank's security interest did not extend to Debtors' share of the lamb crops. Accordingly, First State Bank's motion will be denied.

**Hub City Livestock's Motion for Allowance of and Payment of Administrative Expense.** The two checks comprising the loans at issue in this case were drawn on Hellwig's, not Hub City Livestock's, bank account. Thus, there is no basis for allowing Hub City Livestock's administrative expense claim. Accordingly, its motion will be denied.

**Hellwig's Motion for Allowance of and Payment of Administrative Expense.** A chapter 13 debtor may incur unsecured post-petition debt without Court approval, if the debt is incurred in the ordinary course of business, and if the debt constitutes an administrative expense under 11 U.S.C. § 503(b)(1). 11 U.S.C. §§ 364(a) and 1304.

Two tests are usually employed when determining whether unsecured credit is being incurred in the ordinary course of business. *In re Blessing Industries, Inc.*, 263 B.R. 268, 272 (Bankr. N.D. Iowa 2001)(cites therein). The *vertical* test is whether a reasonable creditor would view the transaction as deviating from the debtor's normal day-to-day operations. *Id.*

> If the transaction is something that might be considered "unusual, controversial or questionable" the creditors have a right to be notified so that they have an opportunity to object.

---

[6] An argument could be made Debtors did not acquire an interest in any of the lambs until the sheep were sorted on June 27, 2005. However, the Court need not decide that question in this case.

*Id.* (quoting *In re Husting Land & Dev., Inc.*, 255 B.R. 772, 779 (Bankr. D. Utah 2000)). The horizontal test considers whether the credit transaction falls within a range of accepted practices within the debtor's particular industry. *Blessing Industries,* 263 B.R. at 272 (cites therein).

In this case, Hellwig failed to produce sufficient evidence for the Court to conclude his loans to Debtors passed either the vertical or the horizontal test. While Debtor testified Hellwig had "helped" him "two or three times," nothing in the record suggests Debtors routinely borrowed large sums from individuals to fund their operation. To the contrary, Debtor testified Debtors had borrowed from First State Bank until 2002; from Ag Services of America in 2003; and from First State Bank of Warner in 2004. The Court thus concludes a reasonable creditor would view Hellwig's loans as deviating from Debtors' normal day-to-day operations. Such a creditor would certainly have wanted an opportunity to review, and if necessary, object to Hellwig's loans.

Similarly, while Hellwig testified he had made unsecured loans to Debtors and others in the past, there was no evidence establishing either the accepted practices within the sheep-raising industry or that Hellwig's loans to Debtor fell within a range of those accepted practices. In fact, Hellwig admitted on cross-examination the loans were not evidenced by a promissory note; there was no agreed upon interest rate; and there was no agreed upon time for repayment. He further admitted such a loan would be unusual in both the lending and the farming industries.

Ordinarily, these findings would end the Court's inquiry. However, Hellwig was an unsophisticated lender, at least within the context of a bankruptcy case. Moreover, it appears Debtors were conducting business without consulting their bankruptcy counsel. Solely due to these circumstances, the Court will consider whether Hellwig's loans constitute an administrative expense under § 503(b)(1).

An administrative expense under § 503(b)(1) must represent "actual, necessary costs and expenses of preserving the estate," a provision which courts generally have construed narrowly. *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*), 290 B.R. 90, 96 (B.A.P. 8th Cir. 2003). Two questions need to be answered. First, did the expense arise from a transaction with the bankruptcy estate? *Id.* Second, did the transaction benefit the estate in some demonstrable way? *Id.*

> The claimant must show that *other* unsecured creditors received tangible benefits from the services or goods provided by the claimant. *In re Jack Winter Apparel, Inc.*, 119 B.R. 629, 633 (E.D. Wisc. 1990); *Kinnan & Kinnan Partnership v. Agristor Leasing*, 116 B.R. 162, 166 (D. Neb. 1990); *In re Herrick*, Bankr. No. 184-00041, slip op. at 2 (Bankr. D.S.D. May 9, 1988). Incidental benefit to the estate or extensive participation in the case, standing alone, is not a sufficient base for an administrative [expense] status. *Jack Winter Apparel, Inc.*, 119 B.R. at 633. A creditor's efforts undertaken solely to further its own self-interest [are] not compensable. *Id.*

*In re Bellman Farms, Inc.*, 140 B.R. 986, 995 (Bankr. D.S.D. 1991). The claimant's burden is by a preponderance of evidence. *Id.*; *In re Bridge Information Systems, Inc.*, 288 B.R. 133, 137-38 (Bankr. E.D. Mo. 2001); and *In re Hanson Industries, Inc.*, 90 B.R. 405, 409 (Bankr. D. Minn. 1988).

In this case, the first question is easily answered in the affirmative. The second question is almost as easily answered in the affirmative, at least in a general sense. Debtor testified that if Hellwig had not lent him the $21,000, he would not have been able to continue to care for the flock. Both Debtor and Hellwig testified that if the flock had been sold in February 2005, it would have brought less than it brought when it was sold in June 2005. Nothing in the record suggests that was not the case. Quantifying the benefit to the estate, however, is more difficult.

Debtor testified that at the time of Hellwig's loans, he had three sets of ewes on Debtors' property: 117 belonging to him;[7] 230 belonging to Van Well; and 120 to 130 belonging to Carmichael.[8] He further testified that in February 2005, he had 250 to 300 lambs that could have been sold. However, while he also testified "about 50%" of the ewes that belonged to Carmichael had lambed by

---

[7] This testimony contradicts Debtor's earlier testimony that at the time of Hellwig's loans, the only sheep – other than those belonging to Carmichael and Van Well – on Debtors' land belonged to Stephanie Fix. Presumably, Debtor meant to say the 117 ewes belonged to Stephanie Fix.

[8] This testimony fails to account for 73 to 83 of the 550 ewes Debtor testified were on Debtors' land at the time of Hellwig's loans.

February 2005 and none of the ewes belonging to Van Well began lambing until March 2005, he did not say how many of the 250 to 300 lambs on hand in February 2005 belonged to Stephanie Fix and how many belonged to Carmichael.

Hellwig testified those lambs would have brought "in the neighborhood of $40 to $50 a head," with some born in January bringing "maybe $50 or $60" a head. However, he did not offer any evidence that would enable the Court to determine how many of the lambs would have brought $40 to $50 a head or how many of them would have brought $50 to $60 a head.[9]

When the lambs were actually sold on June 28, 2005, Debtors' 40% of the lamb crop was sold for $22,285.79. If only 60 of the lambs on hand in February 2005 belonged to Carmichael, and if those lambs had been sold for only $40 a head, the bankruptcy estate received $21,325.79 more on June 28, 2005 than it would have received had the lambs on hand been sold in February 2005.

| | |
|---|---|
| June 28, 2005 sale price | $22,285.79 |
| February 2005 sale price | $ 960.00[10] |
| DIFFERENCE | $21,325.79 |

On the other hand, if all 300 of the lambs on hand in February 2005 belonged to Carmichael, and if those lambs had been sold for $60 a head, the bankruptcy estate received $15,085.79 more on June 28, 2005 than it would have received had the lambs on hand been sold in February 2005.

| | |
|---|---|
| June 28, 2005 sale price | $22,285.79 |
| February 2005 sale price | $ 7,200.00[11] |
| DIFFERENCE | $15,085.79 |

Obviously, the true benefit to the estate lies somewhere between these two sums. However, the burden was on Hellwig to establish that benefit. Accordingly, the Court concludes Hellwig's loans benefitted the estate by $15,085.79.

---

[9] Hellwig did testify the average price for the lambs would have been $40 a head. However, it is mathematically impossible for the average price of lambs worth between $40 and $60 to be $40.

[10] 60 lambs times $40 times 40% (Debtors' share) equals $960.

[11] 300 lambs times $60 times 40% (Debtors' share) equals $7,200.

That leaves only the amount of Hellwig's administrative expense claim to be determined. Debtor testified Hellwig's loans were used to care for all the sheep on Debtors' land, which included not only those belonging to Carmichael and Van Well, but also those belonging to Stephanie Fix. At the conclusion of the hearing, the Court allowed Hellwig the opportunity to submit records to show how the loan proceeds were used. Hellwig submitted an affidavit in which Debtor Marie Fix affied Debtors used Hellwig's loans to care for the flock and to which she attached various cancelled checks totaling $32,477.77.[12]

Many of the checks attached to Marie Fix's affidavit pre-date Hellwig's loans and thus have nothing to do with Debtors' disposition of the loan proceeds. Two others, one for $2,165.40 payable to Sal Hofer, which was written on January 26, 2005 but not processed until February 28, 2005, and another for $6,920.00 payable to Rita Fix, which was dated October 16, 2005 but was processed on February 18, 2005, present problems of their own. However, even if both are included, the most that can be said to have been spent caring for the flock is $13,948.07.[13]

Moreover, some portion of that sum must be attributed to Debtors' caring for Stephanie Fix's ewes and lambs. According to the sale receipt that accompanied Hub City Livestock's check for her sheep, Stephanie Fix owned 119 ewes and 185 lambs. Debtor testified there were 550 ewes on hand at the time of Hellwig's loans. Carmichael and Van Well therefore owned 431 ewes (550 minus 119). According to the sale receipt that accompanied Hub City Livestock's check for Debtors' share of Carmichael's and Van Well's lamb crops, Debtors' 40% share of those lamb crops was 229 lambs. Carmichael and Van Well therefore owned 573 lambs (229 divided by 40%).

---

[12] In its post-hearing brief, First State Bank objected to the affidavit on the basis that "[h]ad [Hellwig], who bears the burden of proof, submitted the checks at the evidentiary hearing, counsel would have had an opportunity to cross-examine the debtors as to the actual expenditures made with the checks." First State Bank did not object at the hearing to the Court's permitting Hellwig to supplement the record in this fashion and therefore waived the right to raise this objection now.

[13] Debtor admitted on cross-examination Debtors might have used a portion of Hellwig's loans to pay living expenses.

| | | | |
|---|---|---|---|
| Stephanie Fix's ewes | 119 | | |
| Stephanie Fix's lambs | 185 | | |
| SUBTOTAL | | 304 | (23.24%) |
| Carmichael's and Van Well's ewes | 431 | | |
| Carmichael's and Van Well's lambs | 573 | | |
| SUBTOTAL | | 1,004 | (76.76%) |
| TOTAL | | 1,308 | (100.00%) |

While the estate benefitted from Debtors' caring for the ewes and lambs belonging to Carmichael and Van Well, it did not benefit from their caring for the ewes and lambs belonging to Stephanie Fix. Thus, 76.76% of the $13,948.07 - or $10,706.54 - spent caring for the flock is attributable to that portion of the flock belonging to Carmichael and Van Well. The sum of $10,706.54 will therefore be allowed as an administrative expense.

The Court will enter appropriate orders.

Sincerely,

Irvin N. Hoyt
Bankruptcy Judge

INH:sh

cc: case file (docket original; serve copies on counsel)

**NOTICE OF ENTRY**
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered on the date shown above.

Charles L. Nail, Jr.
Clerk, U.S. Bankruptcy Court
District of South Dakota